**HEADNOTE:** *Armande Shelten Alford v. State of Maryland*, No. 842, September Term 2016

**CRIMINAL LAW** – Appellant was charged with committing several sexual offenses from June 1, 2010 to July 26, 2010. Appellant became eighteen in May 2010. The victim was a minor.

At trial, appellant attempted to call an expert witness who was a psychologist and an expert in "childhood memories." The Circuit Court for Somerset County refused to let her testify, *sua sponte*, on the ground that the *Frye-Reed* (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Reed v. State*, 283 Md. 374 (1978)) test was not satisfied. Also at trial, the defense argued to the jury that the sexual offences may have occurred when appellant was a minor.

On appeal, appellant argued that the court erred in *sua sponte* excluding the defense expert. Held that the court can *sua sponte* raise *Frye-Reed*, but in this case, the record was too limited to decide the issue.

Appellant also argued that, because it was unclear whether appellant committed the offenses when he was a minor, the circuit court erred in not deciding whether it had subject matter jurisdiction. Held that the court did decide the issue; the evidence was insufficient to rebut the presumption of jurisdiction; and that in an appropriate case, the court should submit the underlying factual question to the factfinder, *i.e.*, the date(s) of the alleged offenses.

Circuit Court for Somerset County
Case No. 19-K-15-010582

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 842

September Term, 2016

_____

ARMANDE SHELTEN ALFORD

v.

STATE OF MARYLAND

_____

Berger,
Reed,
Eyler, James R.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.

_____

Filed:  March 2, 2018

Appellant, Armande Shelten Alford, was charged in the Circuit Court for Somerset County with second-degree sexual offense, third-degree sexual offense, unnatural or perverted practice, sexual abuse of a minor, and second-degree assault. Appellant was charged with committing the offenses from June 1, 2010 to July 26, 2010. This is relevant because appellant turned eighteen in May 2010.

Tried by a jury, appellant was convicted on all counts. Appellant was sentenced to concurrent sentences of fifteen years, with all but seven years suspended, for second-degree sex offense and sexual abuse of a minor, with the remaining convictions merged. Appellant was also ordered to serve three years' probation upon release and to register as a sex offender for life. Appellant timely appealed and presents the following questions for our review:

> 1. Did the trial court err in excluding the defense's expert sua sponte and without a *Frye-Reed* hearing?
>
> 2. In a case where the evidence regarding jurisdiction was closely contested, did the trial court err by failing to make a finding regarding jurisdiction?
>
> 3. In a case where the evidence regarding jurisdiction was closely contested, did the trial court err in refusing to include the alleged possible dates of the offense on the verdict sheet?

For the following reasons, we shall reverse and remand for a new trial.

## BACKGROUND

Ten-year-old D.H., the daughter of Shayla H. and Devon Alford, testified that she had been living with her grandmother, Michelle H., in Hampton, Virginia, since she was

five or six years old.[1]  There was evidence that D.H. lived with her paternal grandmother, Lacolia Alford, and her uncle, appellant, in Crisfield, Maryland, from June 1, 2010 to July 25, 2010.

D.H. testified that one time, when she was four or five years old and living in Crisfield, after her paternal grandmother had gone to the store, appellant asked her to come upstairs to his room to watch a movie.  After that movie ended, appellant "tapped on [her] shoulder and said don't tell anyone what you are about to do.  And then he – well, he pulled out his private part and said to put it in [her] mouth."  Although D.H. was scared, she did as appellant ordered, got on her knees, and put appellant's penis in her mouth.  D.H. offered further details of this incident, including that appellant was lying on the bed, wearing an "orangy red shirt and some blue jeans," his penis was brown, "straight up," and "kind of tall and it had a round – kind of like a round triangle top."

One of the issues in this case concerned the timing of this event.  D.H., who was born in October 2005, believed the assault occurred when she was either four or five years old.  She remembered that the sun was shining and flowers were outside the window.  On cross-examination, when asked whether the incident occurred during a "visit" to her grandmother's, D.H. replied that it did not.  She knew that her father, Devon, was not living in Crisfield at the time of the incident.  Also on cross-examination, D.H. agreed that she spoke to an investigator in Maryland about this incident and agreed

---

[1] It is unnecessary to name the minor victim in this case.  *See Muthukumarana v. Montgomery County*, 370 Md. 447, 458 n. 2 (2002); *Thomas v. State*, 429 Md. 246, 252 n. 4 (2012).

she told that person that it happened "just before" she moved in with her maternal grandmother in Virginia.

Lacolia Alford, appellant's grandmother, testified that appellant lived with her in Crisfield, Maryland from June 1, 2010 to July 26, 2010. According to Lacolia Alford, appellant never watched D.H., and was never alone with her. She confirmed that Devon Alford, appellant's brother, and his daughter, D.H., were also living with her during this timeframe. After July 2010, D.H. moved to Virginia to reside permanently with her maternal grandmother, Michelle H.

Michelle H. testified that D.H. lived with her in Virginia "off and on" after she was born, and lived with her permanently after she was five or six years old. Michelle H. explained that there had been different custody arrangements before that, and at various times, D.H. had stayed with her, her own mother, Shayla H., or her father, Devon Alford, when he lived with Lacolia Alford.

Until the summer of 2015, D.H. spent part of the summers visiting with Lacolia Alford at her home in Crisfield. It was during that summer that D.H. told Michelle H. that she did not want to go to Crisfield, explaining what appellant had done to her. After Michelle H. spoke to D.H., Michelle H. called Lacolia Alford, D.H.'s other grandmother, and told her D.H. was upset and crying. Eventually, Michelle H. came to Crisfield and spoke to the police concerning D.H.'s allegations.

Corporal Johnathon Pruitt, of the Maryland State Police, spoke with Lacolia Alford on July 31, 2015, concerning the allegations in this case. Corporal Pruitt then met with appellant. On August 3, 2015, appellant provided a statement to the officer after he

3

was advised of and waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).[2] In that statement, which was played for the jury, appellant agreed that, when he was 18 years old, during the summer of 2010, D.H. was living with him and his grandmother in Crisfield. At first, appellant denied that he had been alone with D.H., but then confirmed that there was one occasion where, after his grandmother left the house to go to the store, that D.H. went upstairs to watch cartoons.[3] Appellant maintained that he never "watched" D.H., and he denied that anything inappropriate had occurred. Appellant repeated, several times, that "[n]othing happened."

However, towards the end of the interview, when Corporal Pruitt suggested that D.H. may have touched his penis, appellant stated, "[m]aybe she did touch me or something" and "[m]aybe she touched me and I pushed her away[.]" He admitted that on one occasion, D.H. "walked up to me, something like that, touched me or something, and I said, get away from me, or something like that."

Corporal Pruitt further testified that he drafted the initial charging document, charging appellant with the underlying crimes from June 1, 2010 to July 26, 2010. He explained that the latter date was based on the award of custody of D.H. to Michelle H. on July 26, 2010. On cross-examination, Corporal Pruitt agreed that appellant's date of birth was May 16, 1992, and that he was 18 years old on May 16, 2010.

---

[2] A redacted copy of the statement is included with the record on appeal.

[3] Appellant also told a social worker, Zabrina Rehm, that he watched D.H. one time when his grandmother went to the store. Ms. Rehm testified that she spoke with appellant, and he denied touching D.H.

4

After the State completed its case-in-chief, appellant called a number of witnesses to testify on his behalf. His brother, Devon Alford, D.H.'s father, confirmed that he paid child support for D.H. when she lived in Virginia with her mother and maternal grandmother. The payment of child support was suspended when D.H. lived with him in Crisfield, when he resided with his mother, Lacolia Alford. The court admitted child support documentation which showed that: (1) child support for D.H. was suspended on October 30, 2006, when D.H. lived with her father; (2) child support was reinstated on June 4, 2007, when custody was granted back to D.H.'s mother; and, (3) primary custody was granted to D.H.'s mother on July 26, 2010. However, Devon also testified that D.H. would visit his grandmother in Crisfield.[4] Appellant's sister, also named Lacolia, confirmed that D.H. would visit her grandmother in Crisfield during the summers. Devon agreed that he was not present during those visits.

We shall include additional detail in the following discussion.

## DISCUSSION

## I.

Appellant first contends that the court erred in excluding his expert, *sua sponte*, and without a *Frye-Reed* hearing.[5] The State primarily responds that the expert was

---

[4] Devon testified that his mother's name was Lacolia Michelle Alford, and his grandmother's name was Lacolia Ann Alford.

[5] *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Reed v. State*, 283 Md. 374 (1978). *See also Sissoko v. State,* ___ Md. App. ___, No. 613, Sept. Term, 2016 (filed January 31, 2018) (slip op. at 31-39) (discussing in depth *Frye/Reed* and related authorities).

properly excluded based on Maryland Rule 5-702. In reply, appellant contends that the Rule 5-702 argument was not made below and should not be considered.

Near the end of the jury trial, the appellant called his last witness, Dr. Maggie Bruck. At that point, the trial court asked the parties to approach, and the following ensued:

> THE COURT: What kind of witness is this?
>
> [DEFENSE COUNSEL]: She's an expert. She's a psychologist. She has a Ph.D. She's an expert in memory essentially, childhood memories, how memories are formed, how they are retrieved.
>
> THE COURT: How in the world – she's not a physician?
>
> [DEFENSE COUNSEL]: No, she's a Ph.D. in Psychology.
>
> THE COURT: Well, how in the world does she qualify to testify about that?
>
> [DEFENSE COUNSEL]: About memory?
>
> THE COURT: Any more than a lay person?
>
> [DEFENSE COUNSEL]: Because there are a lot of things that are very different than what lay people think about memories that are in fact the case. They do the studies. They interview children. They have controlled groups. They do scientific research. And then she's written books. She's written articles. She's –
>
> THE COURT: I'm sorry to interrupt. But does this even meet the threshold of a Frye-Reed test. It's never been submitted to a Frye-Reed test.
>
> [DEFENSE COUNSEL]: No one asked to have it submitted to a Frye-Reed. And she's been qualified as an expert in the State of Maryland and also several other States and other countries in her field.
>
> THE COURT: What's your position?
>
> [PROSECUTOR]: Her resumé generally says that she's been qualified as an expert in three cases in the State of Maryland and other

6

States. It doesn't specifically say what she's been qualified as an expert in. I'm not quite sure (inaudible) there is an issue with memory that's been generated insofar as [D.H.'s] recollection of the events.

THE COURT: I don't see how her testimony is going to be any more probative than that of a lay person with respect to memory. . . .

The trial court then continued: "I don't think she's qualified and I don't think this would meet the Frye-Reed test . . ." The court then accepted a written proffer of Dr. Bruck's credentials and her proposed testimony, as follows:

Dr. Bruck has a Ph.D. in Experimental Psychology from McGill University. She is currently a Professor at Johns Hopkins University, Division of Child and Adolescent Psychiatry. She written/co-written [sic] 92 Peer Reviewed Articles in her field of study, she also cowrote 2 books, one of which involved a scientific analysis of children's testimony. Dr. Bruck contributed to 24 other books in her fields of study. She has been certified as an expert witness in 15 States, Canada, England, Ireland and Australia.

Dr. Bruck's testimony would provide a summary of the relevant scientific literature on evaluating the reliability of children's statements and highlight how this research and literature is important in evaluating the present case. She will testify generally about autobiographical memory, which is the memory of past events that involve oneself. She would testify that long delays in disclosure have a great impact on one's ability, in particular children, to recall an event accurately. The recall of an event long after it occurs requires the brain to reconstruct the memory. New experiences can interfere with those memories. The contents of memories involve manipulation of the memory during encoding, integration of the information with pre-existing information and then reconstruction of that information when it is retrieved. It is common for the brain to fill in the gaps of the memory during retrieval in order to help make the memory make sense. In addition, suggestion through questions or information coming from adults or other outside experiences can cause confusion in memories and/or false memories.

Dr. Bruck would also testify, that contrary to popularly held beliefs about memory, a very detailed report of an event does not necessarily indicate that the memory is more accurate. Human memories are not a video recording of an event. Things are forgotten, confused and events that

7

never happened can be recalled as if they did. Numerous studies of children and adults have shown that human memory is highly susceptible to outside influences.

Dr. Bruck would testify that the age of an individual at the time the memory is stored has [an] impact on what types of information is stored. For example, a child under the age of 5 is highly unlikely to store memories that are introspective, emotional, temporal, or verbatim. Dr. Bruck will offer an opinion as to what types of details a 4 year old could recall about an event at the age of 9. Specifically, in this case that it is highly unlikely that the child would recall verbatim what words were said, what color clothes she or someone else was wearing, what color the sheets were on the bed and the weather on the date of the memory. Childhood memories are typically fragments, often out of order, and contain guess and incorrect details. Memories formed before 4 or 5 years old are poorly remembered and not well preserved for future use. A more mature memory system develops after age 5-7 years old and stable adult-like autobiographical memories are rare[ly] seen before the age of 8-10 years.

Dr. Bruck would also testify that all memories, whether traumatic or not are subject to decay, forgetting, interference and distortion. The reconstructive process is an unconscious one and therefore, the vividness and apparent authenticity of the memories is not a reliable measure for their truth.

Defense counsel and the court continued to discuss this witness:

[DEFENSE COUNSEL]: And there are in fact (inaudible) where children are interviewed about traumatic events such as a shooting in a school and a child who wasn't even present made claims to remember very specific details about where they were and what they were doing when the shooting happened.

THE COURT: She would offer – according to your proffer Doctor Bruck will offer an opinion as to what types of details a four year old could recall about an event at the age of nine?

[DEFENSE COUNSEL]: Yes.

THE COURT: Well, that's basically she's invading the memory of this particular – there is no way she would know what this particular child thinks.

8

[DEFENSE COUNSEL]: They know based on developmental and tests what types of things a four year old can talk about. Therefore (inaudible) they cam [sic] remember. That's how they remember things. Your brain is developing in its ability to recall the types of things it recalls and their ability to retain that information there is lot of (inaudible).

THE COURT: Isn't it your burden to proffer to the Court ahead of time so the Court can conduct a Frye-Reed test on this topic?

[DEFENSE COUNSEL]: She was disclosed as an expert to the State's Attorney. I believe it is the State's burden to request a Frye-Reed hearing if they would like to challenge that. The State has not done so.

THE COURT: Do you want to say anything at all?

[PROSECUTOR]: The State didn't request a Frye-Reed hearing in this particular matter, Your Honor, but that didn't (inaudible) the disclosure not too long ago in regards to the expert witness.

THE COURT: Do you have any case law or rule that says the State must initiate the Frye-Reed Test?

[DEFENSE COUNSEL]: Not in front of me.

The court then ruled:

THE COURT: I don't think what you proffered satisfies the Frye-Reed Test. I don't think that. She would satisfy the Federal Daubert, D-a-u-b-e-r-t, Test. So you've made your proffer. I'm not going to let her testify.

[DEFENSE COUNSEL]: I understand, Your Honor. What I would indicate is that there has been absolutely no testimony presented to this Court in order for the Court to make that determination. If there was going to be a Frye-Reed hearing there is usually a much more involved hearing where information is presented by the expert and/or other experts as to whether or not –

THE COURT: That's what you should have done. You should have –

[DEFENSE COUNSEL]: I don't have to ask for a Frye-Reed hearing to have my expert qualified.

THE COURT: Well, she's not qualified as an expert.

9

The Court of Appeals has set forth the following with respect to *Frye-Reed*:

> In *Armstead v. State*, 342 Md. 38, 54, 673 A.2d 221, 228-29 (1996), we said:
>
> > In Maryland, novel scientific evidence may become admissible in one of several ways. First, the evidence may be admitted by statute, if a relevant statute exists. See 5 L. McLain, MARYLAND EVIDENCE § 401.4(c), at 277–78 (1987). Second, the proponent can prove that the evidence meets the *Reed* standard of "general acceptance" in the relevant scientific community. *Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 368 (1978) (quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923)). This can be accomplished through expert testimony, judicial notice, or a combination of the two. *Goldstein v. State*, 339 Md. 563, 567, 664 A.2d 375, 376–77 (1995).
> >
> > The "standard enunciated in *Frye v. United States* . . . and adopted by this Court in *Reed v. State* . . . makes evidence emanating from a novel scientific process inadmissible absent a finding that the process is generally accepted by the relevant scientific community." *Clemons v. State*, 392 Md. 339, 343-44, 896 A.2d 1059, 1061 (2006). Since we adopted the *Frye* standard in *Reed v. State*, we have often had the occasion to elaborate on the development and application of the *Frye-Reed* standard.

*Savage v. State*, 455 Md. 138, 157-58 (2017).

Although the general standard of review for admission of expert testimony is discretionary, we recognize that "[a]ppellate review of a trial court's decision regarding admissibility under *Frye-Reed* is *de novo*." *Wilson*, 370 Md. at 201 n. 5; *accord Savage*, 455 Md. at 157. That being said, it remains "the proponent's burden of satisfying *Frye-Reed* by a preponderance of the evidence, and to do so at the initial pre-trial stage[]." *Savage*, 455 Md. at 171; *see also Howard v. State*, 232 Md. App. 125, 168 ("The burden was on the defense to request a *Frye-Reed* hearing. Having failed to do so, Howard cannot complain on appeal that the trial court erred by not holding such a hearing"), *cert.*

10

*denied*, 453 Md. 366 (2017); *Cobey v. State*, 73 Md. App. 233, 238 (1987) ("Under the *Frye-Reed* test, the proponent of a new scientific test bears the burden of producing evidence to establish the technique's general acceptance. The State conceded at oral argument that it also bore the burden of persuasion, as the proponent of the new technique") (internal citation omitted).

In this case, appellant's initial argument is that the trial court erred in even raising *Frye-Reed*, *sua sponte*, absent an objection from the State. Although it is true that the party objecting to expert testimony ordinarily requests such a hearing, as the State points out, the trial court is the "*Frye-Reed* gatekeeper." *See Savage*, 455 Md. at 171 ("The fact that an expert's opinion is not contradicted does not require its admission. To so hold would abrogate the gatekeeping obligation of the trial court, which must inquire into the admissibility under *Frye-Reed* of even uncontradicted evidence"); *see also Howard*, 232 Md. App. at 168; *Addison v. State*, 188 Md. App. 165, 181 (2009) (declining to address a *Frye-Reed* issue raised on appeal and observing that "the grounds for the objection were vague. No *Frye/Reed* analysis was requested, or even hinted to, at trial"), *cert. denied*, 412 Md. 255 (2010). We are not persuaded that the court erred in raising the *Frye-Reed* issue or that appellant's burden in this regard shifted to the State simply because the State did not ask for a *Frye-Reed* hearing prior to trial.

Nevertheless, with respect to the merits of the *Frye-Reed* issue, the State suggests that we "should not decide the *Frye* issue based on the limited record below." We agree. *See Addison*, 188 Md. App. at 181 ("[W]e have never subjected evidence to *Frye/Reed* when *not conducted* or requested at trial") (emphasis added).

11

The State argues, however, that our analysis should not stop there. The State explains that we should affirm because, under Rule 5-702, the court did not abuse its discretion in refusing to admit the proffered evidence. Maryland Rule 5-702 provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill experience, training or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Under this rule, trial courts have "wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony." *Massie v. State*, 349 Md. 834, 850-51 (1998). In the absence of an error of law or fact, we review the admission of expert testimony for abuse of discretion. *See Bomas v. State*, 412 Md. 392, 416-17 (2010); *Wilson v. State*, 370 Md. 191, 200 (2002). Moreover, the trial court's "action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203 (2006) (citations omitted).

Expert testimony "is admissible only if it is relevant in the particular case[.]" *State v. Smullen*, 380 Md. 233, 268 (2004). "The standard for relevance under Maryland common law is whether the jury will receive appreciable help from the expert testimony in resolving the issues presented in the case." *Simmons v. State*, 313 Md. 33, 41 (1988); *see also Sippio v. State*, 350 Md. 633, 648-49 (1998) (observing that the inquiry turns on whether the trier of fact will receive appreciable help, and trial courts "need not consider whether the trier of fact could possibly decide the issue without the expert testimony").

12

The Court of Appeals has made clear that "[t]he burden rests with the proponent of the expert testimony to demonstrate that these requirements have been met." *Rochkind v. Stevenson*, 454 Md. 277, 286 (2017) (citing *Bomas*, 412 Md. at 417-18).

In response to the State's argument, appellant observes that Rule 5-702 was not argued before the trial court, and the court did not exercise discretion under that Rule. Thus, because application of the Rule would require us to exercise discretion in the first instance, we cannot affirm on that basis. We agree. *See State v. Bell*, 334 Md. 178, 188 (1994). We offer no opinion as to whether the court would have abused its discretion had it excluded the evidence after exercising discretion under Rule 5-702. Our conclusion with respect to appellant's first issue is based on the court's lack of exercise of discretion and, with respect to *Frye-Reed*, on the inadequacy of the record.

## II.

In light of our decision on the first issue, we have no need to address the remaining issues. Nevertheless, we shall comment briefly. Appellant contends that, because it was unclear if he committed the alleged offenses while he was a juvenile, the circuit court erred in not making a finding whether it had subject matter jurisdiction over his case. The State responds that appellant has failed to rebut the presumption that jurisdiction was proper in the circuit court. In reply, appellant contends he met his burden.

13

At the end of the State's case-in-chief, defense counsel raised the question of jurisdiction for the first time[6] and made the following argument:

> Based from the information that's been elicited thus far at trial the charging document does indicate a specific range of dates from June lst to the 26th of July.
>
> The testimony that we have heard from the State's witnesses most specifically [D.H.] has provided certainly no specific timeframe, no indication that it was during that timeframe. In particular she had testified only that she lived with Lacolia at the time of this incident. No one has really been able to establish when she was with Lacolia at this point.
>
> According to the testimony of Michelle H. she has always lived with Michelle H. off and on, but did stay with Lacolia. And certainly [D.H.] was unable to give any specific timeframe at all. She thinks she was four or five that encompasses a two year period. Certainly that could have included those dates but there is no evidence specific to those dates. And those dates are rather important given that in May 2010 my client turned eighteen. This Court wouldn't even have jurisdiction over this case if it had occurred just a month prior. And we have no information as to what month it might have occurred only that the sun was out and that there were flowers outside which certainly can be the case in May as well, April and in March of some years.
>
> We have insufficient evidence on all counts as to I think both the jurisdiction of this Court.

---

[6] There is no motion to dismiss for lack of jurisdiction in the record. Nor was there any motion filed or request made for a reverse waiver from the circuit court to juvenile court, as is permitted under Maryland statute and case law. *See generally, Whaley v. State*, 186 Md. App. 429, 444 (2009) ("When a case is brought in criminal court and an accused child is between the ages of fourteen and eighteen, the juvenile defendant may request a transfer back to the juvenile system") (citing Md. Code (2001, 2007 Repl. Vol.), § 4-202 (b) of the Criminal Procedure ("Crim. Proc.") Article); *accord Gaines v. State*, 201 Md. App. 1, 10 (2011). However, subject matter jurisdiction may be raised at any time. *See* Rule 8-131(a) ("The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2-322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court").

Certainly the dates of this incident might have occurred and they certainly have not proven the dates that are charged in the charging document.

The court denied the motion as follows:

All right. The motion is denied. The State has produced sufficient evidence that a reasonable trier of fact could adduce from the evidence all the necessary elements for each of these offenses.

After the defense presented evidence, defense counsel renewed the motion, contending that the child support documentation involving D.H. established that Devon Alford only had custody of his daughter between October 30, 2006 and June 4, 2007. Based on this, counsel averred that the only evidence that D.H. resided in the home in Crisfield was in 2006 and 2007, and "[t]hat is not even close to the dates that are charged in the charging document in this case which [is] June 1st to the 26th of July in 2010." At that time, appellant was "well under the age of eighteen in 2006 and 2007 when [D.H.] actually resided in the household where he resided creating a huge jurisdiction problem for this Court." The court denied the renewed motion without further comment.

This Court has explained subject matter jurisdiction as follows:

Circuit courts of this state . . . derive their jurisdiction from Maryland Constitution, Art. IV, § 20. They are courts of original general jurisdiction, *see Birchead v. State*, 317 Md. 691, 697, 566 A.2d 488, 491 (1989), *First Federated Com. Tr.* [*v. Commissioner* ], 272 Md. [329,] 335 [322 A.2d 539 (1974)], authorized to hear all actions and causes, other than those particularly prescribed by statute or constitutional provision for other fora. *Id*. More particularly, pursuant to Maryland Cts. & Jud. Proc. Code Ann. § 1-501 (1973, 1989 Repl. Vol.), they are

the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional

15

powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal.

*Powell v. State*, 324 Md. 441, 446, 597 A.2d 479 (1991); *see also In re Nahif A.*, 123 Md. App. 193, 212, 717 A.2d 393 (1998) ("Without reference to the nature of the jurisdiction of the court involved, a prima facie presumption of jurisdiction arises from the exercise of it. It is presumed that jurisdiction over the subject matter and parties has been rightfully acquired and exercised") (quoting 21 C.J.S. Courts § 74 at 91-92 (1990)), *overruled on other grounds by In re Antoine M.,* 394 Md. 491, 907 A.2d 158 (2006); 7 Maryland Law Encyclopedia, Courts § 9, p. 19-20 (2013) ("A court of general jurisdiction is presumed to have jurisdiction unless someone proves that there is some valid constitutional or legislative enactment that has withdrawn jurisdiction in a particular case").

"Lack of subject-matter jurisdiction may be raised at any time." *Harris v. Simmons*, 110 Md. App. 95, 113-14, 676 A.2d 944 (1996) (citing *Gardner v. Board of County Comm'rs of St. Mary's County*, 320 Md. 63, 576 A.2d 208 (1990)); *see also Sewell v. United States*, 406 F.2d 1289, 1292 (8th Cir.1969) (observing that lack of subject matter jurisdiction, as opposed to personal jurisdiction, may be raised at any time) (citing *Pon v. United States*, 168 F.2d 373, 374 (1st Cir.1948)).

*Lewis v. State*, 229 Md. App. 86, 100-01 (2016), *aff'd*, 452 Md. 663 (2017).

As for cases brought in the juvenile courts, Maryland Code (1974, 2013 Repl. Vol., 2017 Supp.), Courts & Judicial Proceedings Article ("CJP") § 3-8A-03(a)(1) provides that a circuit court, sitting as a juvenile court, "has exclusive original jurisdiction over [a] child who is alleged to be delinquent[.]" A child is defined as "an individual under the age of 18 years." CJP § 3-8A-01(d). The issue raised on appeal

16

concerns the principle that the jurisdiction of the juvenile court depends on the age of the person at the time the alleged delinquent act was committed. CJP § 3-8A-05(a).[7]

The charging document in this case provides, as to each charge, that the abuse occurred between June 1, 2010 and July 26, 2010. According to the evidence admitted at trial, appellant was born on May 16, 1992, and was 18 years old on May 16, 2010. There was evidence that, from June 1st to July 26th of 2010, appellant was living with his grandmother in Crisfield. There was also evidence that D.H., born in October 2005, visited the Crisfield home during the summer in question. According to D.H., the underlying sexual assault occurred in her paternal grandmother's home when she was either four or five years old. She also told an investigator that the event happened just before she moved in with her maternal grandmother, which would have been around July 26, 2010.

Thus, the dates alleged in the charging document are consistent with D.H.'s testimony as D.H. would have been four years old in the summer of 2010. They are also

---

[7] CJP § 3-8A-03 (d) (4) provides that the juvenile court does not have jurisdiction over charges of second-degree sexual offense and third-degree sexual offense when they are charged under sections 3-306 (a) (1) and 3-307 (a) (1) of the Criminal Law Article. *See* CJP § 3-8A-03 (d) (4). Although Section 3-306 has since been repealed, effective October 1, 2017 (*see* Section 3-304 (a)), those sections generally prohibit the offensive sexual conduct without consent and by the use of force. *See* Md. Code (2002, 2012 Repl. Vol., 2017 Supp.) §§ 3-306 (a) (1), 3-307 (a) (1) of the Criminal Law ("Crim. Law") Article. As noted by appellant, and apparently undisputed by the State, although he was charged generally with these offenses, the jury instructions requested by the State, and read to the jury by the court, establish that the charges alleged against appellant were that he committed the unlawful sexual conduct upon D.H. under 14 years of age when he was at least 4 years older than the victim. *See* Crim. Law §§ 3-306 (a) (3), 3-307 (a) (3). Thus, we are persuaded that the exception to juvenile court jurisdiction set forth in Section 3-8A-03 (d) (4) does not apply in this case.

17

consistent with appellant's statement to the police admitting that he was 18 years old during the summer of 2010, and that D.H. resided with him and his grandmother in Crisfield. We are persuaded that based on the charging documents, the evidence, and the court's exercise of jurisdiction, there was a presumption of subject matter jurisdiction. Thus, appellant needed to rebut that presumption.

Appellant's argument on appeal is that the court did not decide the question of jurisdiction. Appellant's argument to the trial court was that the evidence was insufficient to establish that the incident in question occurred after appellant was eighteen years old. We disagree. After hearing specific argument on the subject from defense counsel, including at the end of the State's case-in-chief and at the end of all the evidence, we are persuaded that the court implicitly found that appellant was 18 years old when the offenses occurred when it denied the motions for judgment of acquittal. *See generally, Wilder v. State*, 191 Md. App. 319, 344 (2010) ("Although the trial court did not articulate the basis for its ruling, it overruled defense counsel's objection only after an extensive argument by the State in favor of admissibility. We presume that the trial judge knew the law and properly applied it in overruling the defense objection to [the] testimony") (citing *State v. Chaney*, 375 Md. 168, 179-80 (2003)).

Despite the limited nature of appellant's argument, we will comment on the propriety of the court's ruling. To determine whether appellant rebutted that presumption, we are guided by *In re John F.*, 169 Md. App. 171 (2006). There, the Washington County Department of Social Services ("Department") filed petitions alleging that John F., Jr. and Shawn F. were Children in Need of Assistance ("CINA").

18

The petitions alleged that the children's mother, Sherry F., lived in an apartment in Hagerstown. *In re John F*., 169 Md. App. at 173-74. Sherry F. challenged the petitions on territorial jurisdiction grounds, alleging that she and the children lived in Pennsylvania. *Id*. at 178. We set forth the Department's response in favor of Maryland jurisdiction as including the fact that the father resided in Maryland, the boys had resided in Maryland within six months prior to the filing of the CINA petition, the court had jurisdiction over the boys' sisters, and because "there was no credible evidence that the boys' residence was no longer in Maryland." *Id*.

In considering the issue under the Maryland Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), Md. Code (1984, 2004 Repl. Vol.), section 9.5-201 of the Family Law Article ("FL"), we relied heavily on our prior opinion in *In re Nahif A*., 123 Md. App. 193 (1998). We explained that case as follows:

> In *In re Nahif A.*, 123 Md. App. 193, 717 A.2d 393 (1998), we addressed the burden of proof in a challenge to subject matter jurisdiction in a juvenile case. There, the State filed two juvenile delinquency petitions against Nahif in the Circuit Court for Frederick County. The petitions set forth Nahif's birth date. A delinquency hearing was held in the circuit court, sitting as the Juvenile Court. After the close of the State's case, Nahif moved to dismiss, arguing that the State had not proven that the court had subject matter jurisdiction because it had not put on evidence that he was a juvenile. The court granted the State's motion to reopen its case to establish Nahif's birth date. Thereafter, the court adjudicated Nahif to be delinquent.
>
> Nahif appealed to this Court, arguing that the Juvenile Court had abused its discretion by allowing the State to reopen its case. Rejecting that argument, we explained that "'a prima facie presumption of jurisdiction arises from the exercise of it. It is presumed that jurisdiction over the subject matter and parties has been rightfully acquired and exercised.'" *In re Nahif A., supra*, 123 Md. App. at 212, 717 A.2d 393 (quoting 21 C.J.S. Courts § 74 at 91-92 (1990) (footnotes omitted)). Further, "'the jurisdiction of a court of general jurisdiction is presumed, unless the contrary is made to

19

appear; and every presumption not inconsistent with the record is to be indulged in favor of such jurisdiction, at least when the allegations of the petition show jurisdiction.'" *Id*. (quoting 21 C.J.S. Courts § 74 at 91-92). Accordingly, the burden is on the party challenging subject matter jurisdiction to rebut that presumption. *Id*. at 212-13, 717 A.2d 393.

We held that the delinquency petition and the Juvenile Court's exercise of jurisdiction over the case gave rise to a presumption in favor of subject matter jurisdiction, and that the burden was on Nahif to introduce evidence sufficient to rebut that presumption. Specifically, it was Nahif's burden to show that he was *not* a juvenile. Because he did not introduce any such evidence, he failed to rebut the presumption in favor of subject matter jurisdiction. Instead, he attempted to shift the burden to the State, which was improper. Thus, the Juvenile Court could not have abused its discretion in allowing the State to reopen its case to introduce evidence that Nahif was a juvenile because it was not necessary for the State to do so anyway.

*In re John F*., 169 Md. App. at 180-81 (emphasis in original).

We went on to hold that the juvenile court in *In re John F*. was "a court of general jurisdiction with jurisdiction over special causes of action set forth by statute[.]" and that "the presumption in favor of subject matter jurisdiction applies." *In re John F*., 169 Md. App. at 182-83. We then held that, under the factual circumstances set forth in the petition and at the adjudicatory hearing, Sherry F. did not rebut the presumption of subject matter jurisdiction. We observed, "[t]he evidence that the appellant introduced to show that the Juvenile Court lacked subject matter jurisdiction was insufficient to rebut the presumption that the court had jurisdiction over the subject matter. The appellant needed to show that Maryland was not the boys' home state, and that Pennsylvania was." *Id*. at 184.

The only evidence D.H. presented, other than questioning D.H.'s recollection, consisted of custody and child support documents concerning when D.H.'s father's child

20

support obligations were suspended. Although that evidence showed that D.H.'s father, Devon, did not have to pay child support in parts of 2006 and 2007 because D.H. was in his custody, it had no bearing on whether appellant was 18 years old when these incidents were alleged to have occurred. *Cf. Jones v. State*, 172 Md. App. 444, 457 ("Evidence of a mere possibility that a crime did not take place in Maryland is not sufficient to create a genuine factual dispute about territorial jurisdiction"), *cert. denied*, 399 Md. 33 (2007). Moreover, appellant did not meet his burden of countering evidence that D.H. visited Lacolia Alford in Crisfield, which was also appellant's primary residence, at the time in question. We hold that appellant failed to meet his burden of rebutting the presumption of subject matter jurisdiction.

We also conclude that appellant's reliance on *State v. Coffield*, 17 Md. App. 305 (1973), is misplaced. In that case, two indictments were filed against Coffield involving the same victim: one indictment for murder, and a separate indictment for armed robbery. *Id*. at 308. There was no dispute that Coffield was a juvenile at the time of the offenses. *Id*. at 310. The basic question presented was whether the armed robbery indictment was properly filed in the circuit court, as opposed to the juvenile court, because the circuit court would only have jurisdiction over the armed robbery case if that robbery arose out of the murder that was charged in the first indictment. *Id*. at 309-12. Ultimately, resolution of that question required a finding of fact, and, because no hearing occurred and no findings were made, this Court vacated the circuit court's order dismissing the armed robbery indictment and remanded the case for an evidentiary hearing. *Id*. at 312-15.

21

In this case, by contrast, the charging document, on its face, sets forth that the prohibited acts occurred when appellant was 18 years old and within the jurisdiction of the circuit court. Further, an evidentiary hearing occurred in this case, namely a trial, where the victim testified and other evidence as to when the events allegedly occurred was received. That evidence included appellant's own statement to the police. The jurisdictional issue, raised in the motion for judgment of acquittal, was before the circuit court, both legally *and* factually, unlike in *Coffield.*

### III.

Finally, appellant contends that the court erred in not including the dates of the alleged offenses on the verdict sheet. The State responds that, because the dates of the offense concern the subject matter jurisdiction of the court, the issue was for the court to decide and not a question to be submitted to the jury. The issue arose as follows:

> THE COURT: Have you both seen the verdict sheet? Somebody prepared this verdict sheet. I don't know.
>
> [DEFENSE COUNSEL]: I have not, but, Your Honor, given the nature of the evidence I'm going to ask that the charging be included on the verdict sheet.
>
> THE COURT: That the what?
>
> [DEFENSE COUNSEL]: That the dates that he is charged with be included on the verdict sheet because it's the State's burden to prove it happened when they charged that it happened.
>
> THE COURT: Well, show it to Ms. Simpson, please.
>
> I don't know why the dates have to be on there.
>
> [PROSECUTOR]: Your Honor, I don't believe that the dates have to be on there. I've never seen a verdict sheet with the dates on it.

22

THE COURT: You're free to argue –

[DEFENSE COUNSEL]: I think it's particularly relevant in this case given the evidence.

THE COURT: You're free to argue dates. . . .[8]

We review a trial judge's decision to use a particular verdict sheet under an abuse of discretion standard. *See S&S Oil, Inc. v. Jackson*, 428 Md. 624, 629 (2012). Under the abuse of discretion standard, we shall reverse if we find that the trial judge erred and that the error prejudiced the defendant. *Id*. Further, "the contents of the verdict sheet do not constitute the jury's verdict." *Ogundipe v. State*, 424 Md. 58, 72 (2011). Instead, "the verdict sheet itself is a tool for the jury to utilize in deciding its verdict but it does not constitute the verdict." *Id*. (quoting *Ogundipe v. State*, 191 Md. App. 370, 381 (2010)).

As we consider this issue, we note that, like the second issue raised, appellant's overall argument is that the State failed to prove that he was 18 years old when the offenses occurred. Whereas in the second issue appellant asks us to hold that the issue was jurisdictional, and thereby an issue of law, in this third question presented, he argues that the jury should have decided the issue as a factual question whether the offenses occurred when he was 18 years old.

We agree that, in an appropriate case, the court should submit the underlying factual question to the jury, *i.e.,* the date(s) of the alleged incidents, but as discussed above, appellant did not rebut the presumption of subject matter jurisdiction. The case

---

[8] Following this exchange, there was no request to instruct the jury concerning the dates of the alleged offenses. There also was no objection to the instructions, and no further mention of the verdict sheet.

23

was tried on the State's premise that the criminal offenses occurred in June and July 2010, and the evidence was sufficient to sustain the convictions.

**JUDGMENTS OF THE CIRCUIT COURT FOR SOMERSET COUNTY REVERSED. CASE REMANDED FOR A NEW TRIAL.**
**COSTS TO BE PAID BY SOMERSET COUNTY.**

24